## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| DANNY MARSHALL SMITH, as | } | |
| Personal Representative and Executor | } | |
| of the Estate of DEBRA OLOFSSON | } | |
| TRIMBLE, Deceased, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.:  7:08-CV-1546-RDP |
| | } | |
| BAMA URGENT MEDICINE, INC., et | } | |
| al., | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

This matter is before the court on (1) the Motion for Summary Judgment on behalf of Defendant Irma Higginbotham, M.D. (Doc. # 146), and (2) the Motion for Summary Judgment filed by Defendants Bama Urgent Medicine, Inc. ("Bama Urgent") and Stephen A. Roberts, D.O. (Doc. # 147). Both Motions have been fully briefed. (Docs. # 146, 147, 148, 149, 150, 151 and 152).

**I.     Background**

This is a medical malpractice action against Defendants Bama Urgent Medicine, Inc., Dr. Stephen A. Roberts, and Dr. Irma Higginbotham.

Plaintiff's decedent, Debra Olofsson Trimble ("Trimble"), initially presented to Bama Urgent Medicine, a walk-in urgent care clinic, complaining of chills, weakness, loss of appetite, and rectal bleeding and/or blood in the stool. She reported a history of hemorrhoids and Dr. Ira Higginbotham identified a hemorrhoid present that day. Dr. Higginbotham spoke with Trimble, performed a physical examination, and ordered various laboratory and radiographic tests. Dr. Higginbotham's diagnosis was fatigue/weakness, rectal bleeding/hemorrhoids – stable; and smoking addiction. A

chest x-ray was obtained on September 29, 2006. In the days following Trimble's visit with Dr. Higginbotham, additional tests including laboratory tests, and CT scan, were obtained. A colonoscopy was neither ordered nor performed.

After the results of those tests were received, Trimble was then referred to Dr. James Saxon on October 9, 2006 for evaluation and treatment. Dr. Saxon is an Internal Medicine physician in Tuscaloosa who did not practice at Bama Urgent Medicine.  Trimble was also seen by another physician, Dr. Perry Lovely, on December 4 and December 6, 2006. She was later seen by Dr. Wesley Spruill.

Trimble returned to Bama Urgent Medicine on December 28, 2006 and was treated by Dr. Stephen Roberts. She complained of a headache, sinus congestion, nausea, achiness and fatigue.  Dr. Roberts spoke with Trimble and performed a physical examination. He diagnosed her with a headache, pharyngitis, sinusitis, fatigue, chronic low back pain, and tobacco addiction.  Neither Dr. Roberts nor Dr. Higginbotham diagnosed her as having cancer.

In 2007 (the following year), Trimble moved to Tennessee.  On October 31, 2007, she was treated at Laughlin Memorial Hospital in Greenville Tennessee.  The physicians there found her to have colorectal cancer.  Her oncologist, Dr. Dharmen Patel, diagnosed Trimble as having invasive, poorly differentiated, Stage IV adenocarcinoma.  Trimble died on May 10, 2009.

Plaintiff alleges that Defendants breached the applicable standard of care when Trimble was treated at the Bama Urgent Medicine facility in 2006 and that these alleged breaches of the standard of care proximately caused injury, death and damages as a result of a delay in the diagnosis of her colorectal cancer. (Doc. # 65 at 3).

Before trial, Defendants filed various motions in limine, including 1) Defendant Higginbotham's Motion to Preclude Standard of Care Testimony by Dr. Perry Hookman (Doc. # 97), and (2) Motion of the Defendants Bama Urgent Medicine, Inc. and Stephen A. Roberts, D.O., to Exclude Expert Testimony (Doc. # 98).  Both motions were filed pursuant to the Alabama Medical Liability Act ("AMLA"), *Alabama Code* 1975 § 6-5-548, and sought to exclude expert standard of care testimony from Plaintiff's proposed standard of care expert, Dr. Perry Hookman.  On July 19, 2011, the court excluded Dr. Hookman's testimony because Dr. Hookman is not "a similarly situated heath care provider" under the Alabama Medical Liability Act ("AMLA"), *Alabama Code* 1975 § 6-5-548. (Doc. # 128).  On August 16, 2011, Plaintiff asked the court to reconsider its ruling excluding Dr. Hookman's standard of care testimony.  (Doc. # 132).  On September 14, 2011, the court denied Plaintiff's motion.  (Doc. # 143).

Thereafter, on September 22, 2011, the court conducted a pre-trial telephone status conference with counsel.  At that status conference, although maintaining the position that exclusion of Dr. Hookman's testimony was in error, Plaintiff's counsel conceded that the exclusion of Dr. Hookman's standard of care testimony operated as a "technical knock-out" to Plaintiff's case because it prohibited Plaintiff from presenting expert testimony required under the AMLA to establish the applicable standard of care which was allegedly breached.  Therefore, by agreement of the parties, the trial of this case was canceled.  It was agreed that Defendants would have the opportunity to move for summary judgment based upon the court's exclusion of Plaintiff's proposed expert testimony and that Plaintiff, at least as to Defendant Higginbotham, would respond with no further evidence to allow for an appeal of the court's decision excluding Dr. Hookman's testimony. Despite reaching this agreement, Plaintiff has now responded to Defendants' Motions for Summary

Judgment with newly submitted documents which the court has ruled will be considered as part of the Rule 56 record.  (Doc. # 157).  This new evidence relates to Plaintiff's argument (in response to Defendants' Motions for Summary Judgment) that expert testimony is not legally required to establish the relevant standard of care in this case, and that the newly submitted documents are sufficient under Alabama law to establish the relevant standard of care and violations thereof by Defendants.

## II.    Discussion

The Alabama Supreme Court has held that "'[i]n a medical-malpractice action, the plaintiff ordinarily is required to present expert testimony as to the relevant standard of care.'" *Cobb v. Fisher*, 20 So.3d 1253, 1257 (Ala. 2009) (quoting *Martin v. Dyas*, 896 So.2d 436, 441 (Ala. 2004)). "A plaintiff in a medical-malpractice action must also present expert testimony establishing a causal connection between the defendant's act or omission constituting the alleged breach and the injury suffered by the plaintiff." *Cobb*, 20 So.3d at 1257 (quoting *Sorrell v. King*, 946 So.2d 854, 862 (Ala. 2006)). An exception to the expert testimony rule is "where want of skill or lack of care is so apparent as to be understood by a layman, and requires only common knowledge and experience to understand it." *Id.* (citations and internal modifications omitted).

In *Ex parte HealthSouth,* the Alabama Supreme Court reformulated the statement of the exceptions to the general rule requiring expert testimony. *Ex parte HealthSouth Corp.*, 851 So.2d 33, 38 (Ala. 2002). There, the Alabama Supreme Court held that:

> A plaintiff need not offer testimony of an expert witness in a medical-malpractice case (a) when the act or omission is in a class of cases where want of skill or lack of care is so apparent ... as to be understood by a layman, and requires only common knowledge and experience to understand it, ..., such as when a foreign object is left in, the wrong body part is operated on, or a call for assistance is ignored for an

unreasonable time; or (b) when a plaintiff either relies on a recognized standard or authoritative medical text or treatise, ..., or is himself a qualified medical expert.

*Ex parte HealthSouth Corp.*, 851 So.2d at 42 (internal citations and quotation marks omitted).

Thus, in opposition to Defendants' motions for summary judgment, Plaintiff makes two primary arguments: (1) that the court erred in excluding Plaintiff's proposed standard of care testimony from Dr. Perry Hookman; but, in any event, (2) to get their case to the trier of fact, Plaintiff is not required to produce expert testimony in light of the documents submitted in response to Defendants' motions for summary judgment.

### A.    Dr. Hookman's Testimony Was Properly Excluded Under § 6-5-548(b)

The court excluded Dr. Hookman's testimony because Dr. Hookman is not "a similarly situated heath care provider" under the  Alabama Medical Liability Act ("AMLA"), *Alabama Code* 1975 § 6-5-548.  (Docs. # 128, 143).  The court analyzed this issue under § 6-5-548(b) because, at the time it decided the motion to strike, the record did not establish that either Dr. Higginbotham or Dr. Roberts qualified as a "specialist" under § 6-5-548(c).  Section 6-5-548(b), which applies to defendant health care providers who are *not* specialists, provides:

> (b) ... [A] 'similarly situated health care provider' is one who meets all of the following qualifications:
>
>     (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
>
>     (2) Is trained and experienced in the same discipline or school of practice.
>
>     (3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

*Alabama Code* 1975 § 6-5-548(b).  Under § 6-5-548(b), Dr. Hookman is not similarly situated to either Dr. Higginbotham or Dr. Roberts because he did not practice in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care.  To the contrary, the settings in which Dr. Hookman on the one hand, and Drs. Higginbotham and Roberts on the other, work are *materially* different. (Docs. # 128, 143).

Dr. Hookman is board certified in specialties in which the defendant physicians are not certified and in which they do not practice.  He has maintained a hospital-based medical practice and, even more critically, has *not* maintained an office-based practice, for the last twelve years.  (Doc. # 97-1).  Even during the time Dr. Hookman maintained an office-based practice, the record is silent as to whether he ever worked in a walk-in, urgent care setting.  Thus, there is no Rule 56 evidence that Dr. Hookman *ever* worked in a setting even remotely similar to that in which the claims in this case arose.  Indeed, there is no such evidence that he has ever worked in "the same discipline or school of practice" as Drs. Higginbotham or Roberts as required by § 6-5-548(b).

In response to Defendant Roberts' Motion for Summary Judgment, Plaintiff cites Dr. Hookman's excluded testimony and argues that Dr. Roberts was not practicing in his specialty of family medicine when he allegedly breached the standard of care as to Trimble.  Rather, Plaintiff argues that Dr. Roberts breached the standard of care with regard to practice management.  This argument was previously made by Plaintiff in reference to the question of whether the admissibility of Dr. Hookman's testimony should be analyzed under § 6-5-548(b) or (c).  (Doc. # 150 at 13).  Notwithstanding this differently nuanced argument, if Dr. Roberts was not acting as a specialist at the time of the alleged negligence, then the analysis of the admissibility of Dr. Hookman's testimony falls under § 6-5-548(b).  It follows that, for the same reasons his proffered testimony is inadmissible

on the standard of care applicable to medical care in a urgent care clinic, Dr. Hookman's testimony is similarly inadmissible on the appropriate standard of care for practice management and supervision in an urgent care clinic.  There is no evidence that Dr. Hookman ever managed a practice in even a remotely comparable setting to Dr. Roberts.  Thus, his testimony on the issue of the appropriate standard of care in medical management and supervision was also properly excluded.

### B.    Dr. Hookman's Testimony Is Also Due to Be Excluded Under § 6-5-548(c)

In support of their Motion for Summary Judgment, Bama Urgent and Dr. Roberts make the additional argument that Dr. Roberts is a specialist under § 6-5-548(c), and that therefore, as to him, Dr. Hookman's testimony was even more clearly due to be excluded.  Plaintiff argues that the court has concluded that Dr. Roberts was not a specialist.  This argument misconstrues the court's Order excluding Dr. Hookman's testimony.

What the court held previously was that, at the stage when it was considering the motion to strike Dr. Hookman's testimony, Dr. Roberts had not properly submitted evidence going to the issue of whether he was a specialist.  (Doc. # 128 at 8).  Therefore, the court granted Plaintiff's motion to strike that evidence.  However, in reaching this conclusion, the court stated that "if Dr. Roberts were considered a specialist, Dr. Hookman's proposed standard of care testimony would clearly not be admissible against him because Drs. Roberts and Hookman are not 'certified by the same American board in the same specialty.'  § 6-5-548(e)." (Doc. # 128 at 8, n.1).

Section 6-5-548(c), which applies to defendant health care providers who are specialists, provides:

(c) ... [A] 'similarly situated health care provider' is one who meets all of the following requirements:

(1) Is licensed by the appropriate regulatory board or agency of this or some other state.

(2) Is trained and experienced in the same speciality.

(3) Is certified by an appropriate American board in the same specialty.

(4) Has practiced in this speciality during the year preceding the date that the alleged breach of the standard of care occurred.

*Alabama Code* 1975 § 6-5-548(c).

Section 6-5-548(e) governs the competency of expert witnesses to testify about a breach of the standard of care in medical malpractice actions:

(e) The purpose of this section is to establish a relative standard of care for heath care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a 'similarly situated health care provider' as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty.

*Alabama Code* 1975 § 6-5-548(e).

Dr. Roberts has presented undisputed evidence that he is a specialist in Family Medicine because he was board certified and practicing in that specialty during the relevant time period. Plaintiff's argument in opposition to Defendant Roberts' motion for summary judgment does nothing to attack the conclusion that he was a specialist. Rather, Plaintiff argues that Dr. Roberts breached the standard of care while he was not practicing in his specialty.

8

Defendant Roberts argues that, because Dr. Hookman is not board certified in Family Medicine, but rather is board certified in Internal Medicine and Gastroenterology, under § 6-5-548(c) and (e), Dr. Hookman's proposed testimony cannot establish a breach of the relevant standard of care against to him. Section 6-5-548(e), which is applicable to specialists, provides that "a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care *... only if he or she is certified by the same American board in the same specialty.*" § 6-5-548(e). Thus, to the extent that Dr. Roberts was practicing in the specialty of family care, Dr. Hookman's testimony is clearly inadmissible against him under § 6-5-548(c). And, to the extent that Dr. Roberts may not have been practicing within his specialty at the time of the alleged breach of the standard of care, Dr. Hookman's testimony is not admissible against him for the reasons discussed above in reference to § 6-5-548(b).

### C.    Bama Urgent Is Not Liable on a *Respondeat Superior* Theory

#### 1.    Bama Urgent Cannot Be Held Liable If the Alleged Employees Are Not Liable

Alabama law is crystal clear on this point: "The vicarious liability of a putative master under the rule of *respondeat superior* depends upon the liability of the putative servant. ... Thus, if a putative servant is not liable, ..., no liability exists to be visited upon the putative master under the rule of *respondeat superior*. " *Hollis v. City of Brighton*, 885 So.2d 135, 141-42 (Ala. 2004) citing *Larry Terry Contractors, Inc. v. Bogle*, 404 So.2d 613, 614 (Ala. 1981)). Because Defendants Higginbotham and Roberts are both entitled to summary judgment because Plaintiff has failed to establish a *prima facie* case against them, Defendant Bama Urgent is similarly entitled to summary judgment on all claims against it which rest on a theory of *respondeat superior.*

9

### 2. Bama Urgent Cannot Be Held Liable For Acts Committed by an Independent Contractor

Under Alabama law, Bama Urgent may not be held liable under a *respondeat superior* theory for the actions of Dr. Roberts or Dr. Higginbotham unless they are employees or agents of Bama Urgent. *See Humana Medical Corporation of Alabama v. Traffanstedt*, 597 So.2d 667, 668 (Ala. 1992). Defendant Bama Urgent argues that Dr. Higginbotham is an independent contractor. If she is an independent contractor, rather than an employee or agent of Bama Urgent, Bama Urgent cannot be held vicariously liable for her actions. *See Clark v. Allied Healthcare Products, Inc.*, 601 So.2d 902, 904 (Ala. 1992); *Dickinson v. City of Huntsville*, 822 So.2d 411, 416 (Ala. 2001); *Brilliant v. Royal*, 582 So.2d 512, 517 (Ala. 1991).

> In determining whether a person is an independent contractor, [the Alabama Supreme Court uses] the "right-of-control" test, and ... consider[s] four factors: (1) direct evidence of the right or exercise of control; (2) the method of payment used; (3) whether the alleged principal had the right to terminate employment; and (4) the right to control another's time.... The party asserting the existence of an agency relationship has the burden of presenting sufficient evidence to provide the existence of that relationship.

*Dickinson,* 822 So.2d at 416 (citations omitted).

Bama Urgent and Dr. Roberts presented the following evidence regarding Dr. Higginbotham's status with Bama Urgent:  Dr. Higginbotham provided care to patients at Bama Urgent periodically or on as needed basis. (Doc. # 148-1, ¶ 5). Dr. Higginbotham was paid an hourly rate for her work, and she had no employment contract with Bama Urgent. (*Id.*). Bama Urgent did not provide medical malpractice insurance or any other type of insurance or benefits to Dr. Higginbotham. (*Id.*). Bama Urgent did not control, or retain the right to control, her medical

decisions. (*Id.*). All of the care and treatment she provided was based on her own clinical judgment. (*Id.*).

Plaintiff presents three pieces of evidence in an attempt to establish that Plaintiff was not an independent contractor: (1) Dr. Higginbotham had no contract with Bama Urgent designating her an independent contractor; (2) Dr. Higginbotham's services were billed through Bama Urgent; and (3) Dr. Higginbotham was required to follow Bama Urgent's procedures and practices. (Doc. # 150 at 16). But this evidence falls far short of the required showing.

First, Dr. Higginbotham may not have been formally designated in writing as an independent contractor. However, there is no evidence in the record that she was ever offered "employment" with Bama Urgent. Second, billing for her services may have occurred through Bama Urgent, but Dr. Higginbotham was merely paid an hourly rate for her services. Finally, "'being subject to hospitals' rules as a condition of staff privileges does not remotely make a private physician an employee of that hospital.'" *Brilliant*, 582 So.2d at 516 (quoting *Lilly v. Fieldstone*, 876 F.2d 857 (10th Cir.1989)).

Plaintiff has not presented sufficient evidence to raise a genuine issue of material fact on the question of whether Dr. Higginbotham was an employee or agent of Bama Urgent. Accordingly, the court concludes that, even if there was evidence establishing that Dr. Higginbotham is liable to Plaintiff (and, to be clear, here there is no such evidence), Plaintiff has not established a basis for holding Bama Urgent liable under a *respondeat superior* theory.

### 3.     Bama Urgent Is Not Liable Under a Corporate Negligence Theory

Plaintiff argues that, even in the absence of an employment or agency relationship with Dr. Higginbotham, Bama Urgent may be held liable under the theory of "corporate negligence" for the

11

consequences of Dr. Higginbotham's actions if Bama Urgent was itself negligent. *See Humana Medical Corporation of Alabama v. Traffanstedt*, 597 So.2d 667, 668 (Ala. 1992).  Under this theory, "'[t]he liability of the hospital is based on its independent negligence in appointing to its medical staff a physician who is incompetent or otherwise unfit, or in failing to properly supervise members of its medical staff.'"  *Traffanstedt*, 597 So.2d at 669 (citation omitted).  However, to prevail on such a theory, Plaintiff must prove more than a single instance of wrongful conduct on the part of Dr. Higginbotham.  Plaintiff must demonstrate that Bama Urgent was negligent in allowing Dr. Higginbotham to treat patients or in monitoring her. *See Clark v. Allied Healthcare Products, Inc.*, 601 So.2d 902, 904 (Ala. 1992).  Plaintiff's bare allegations of negligence on Bama Urgent's part of a failure to train or supervise are insufficient.  Bama Urgent allowed a fully trained physician to see patients for a few hours a week at its facility.  Although the testimony indicates that there was a difference in Dr. Higginbotham's and Dr. Saxon's understanding about which maladies Dr. Higginbotham intended to refer to Dr. Saxon for treatment, the record does not establish who may have been at fault for any misunderstanding in that instance.[1]  Plaintiff has produced no evidence, as opposed to rank speculation, that Bama Urgent was negligent. Accordingly, Bama Urgent is entitled to summary judgment on Plaintiff's corporate negligence theory.

---

[1] Plaintiff's argument that the rectal bleeding was the "single most important medical issue that Ms. Trimble was facing" is a conclusion based on facts which were not clear at the time the referral was made, *i.e.,* the importance of those facts was only revealed by her eventual diagnosis. Hindsight, as they say, is 20-20.  But, Alabama's malpractice standards are based upon carefully crafted legal burdens and procedures, not hindsight.

**D.   The Guidelines Presented By Plaintiff Do Not Satisfy Any Exception to The AMLA's General Rule Requiring Expert Testimony**

Plaintiff argues that the "long-established exception" to the requirement that medical malpractice be established through expert testimony is satisfied in this case by the American Cancer Society's screening guidelines (the "Guidelines") for the detection of cancer. Plaintiff argues that these Guidelines establish a "recognized standard" for the proper standard of care. (Doc. # 150 at 6); *see Healthsouth*, 851 So.2d at 37. Relying on an unpublished decision from the Middle District of Pennsylvania, Plaintiff concludes that the American Cancer Society's screening guidelines for the detection of cancer are "nationally recognized," "respected" and "good grounds" for opinions regarding treatment standards. *U.S. v. Salko*, 2008 WL 4682804 at *4 (M.D. Pa., Oct. 22, 2008). However, the *Salko* case is not on point. In that case, the court determined that an *expert's testimony*, which was bolstered by "standards articulated by the American Cancer Society, American Medical Association, and the American College of Radiology, nationally recognized and respected institutions that regularly publish nationally-circulated scholarly and practitioner materials" would be admissible under Federal Rule of Evidence 702. *Salko*, 2008 WL 4682804 at *4-5. *Salko* hales from a state where the AMLA is not applicable, and that decision does not even suggest that the written standards at issue obviated the need for expert testimony on the standard of care.

As Defendants point out, the Guidelines submitted by Plaintiff are recommendations for patients. The Guidelines state that the American Cancer Society "recommends" these tests and that patients talk to their doctor about what colorectal cancer screening is best for them. (Doc. # 150-1).

Plaintiff argues that the Guidelines should be "admitted to prove what is the proper practice insofar as medical treatment is concerned." (Doc. # 154 at 2). Plaintiff also submitted "A Cancer

Journal for Clinicians published by the American Cancer Society" (the "Journal") which is cited within the Guidelines as a reference. The court denied Defendants' Motions to Strike these documents and granted Plaintiff's Motion for Leave to Supplement Summary Judgment Evidentiary Materials with the Journal. (Doc. # 157). In support of the position that the documents are admissible, Plaintiff has argued that the Journal clarifies the Guidelines, which purportedly set forth the standard of care. (Doc. # 156 at 1). Plaintiff urges the court to consider these documents and to conclude that, taken together, they establish that the proper standard of care provided that any positive fecal occult blood test should have been followed up by a colonoscopy regardless of the patient's age. (Docs. # 150 at 7 and 154 at 5-6).

Although the American Cancer Society is a well-respected organization, an unwarranted logical leap is required to reach to the conclusion that recommendations made in the Guidelines are actually the *standard of care* for any particular type of medical practice. Indeed, a review of the Journal article submitted by Plaintiff, and cited as a reference by the Guidelines, actually negates the idea that the Guidelines set forth the predominant *standard of care*. The Journal itself clarifies that the American Cancer Society "recommends" certain things in the Guidelines. (Doc. # 154-1 at 8). However, the Journal also states that "data ... reveals ... that follow up of positive FOBTs *commonly* is inappropriate" (Doc. # 154-1 at 9) (emphasis added). It explains that "[o]ne third of adults in the National Health Interview Survey (NHIS) who reported having had a positive FOBT reported that they received no follow up." (Doc. # 154-1 at 9). The Journal's conclusion with regard to the screening for colorectal cancer is this:

> The findings on inappropriate testing with FOBT, as well as inappropriate follow up
> of a positive FOBT, indicate the need for a highly focused educational campaign to

14

help clinicians understand that FOBT testing should follow manufacturer's instructions, *and that positive tests should be followed up with colonoscopy."*

(Doc. # 154-1 at 9) (emphasis added). This conclusion indicates that, although all positive FOBTs ideally *should* be followed up with a colonoscopy, this practice apparently does not represent the current "standard of care." Thus, taken together, the documents submitted by Plaintiff are insufficient to establish that, in any particular practice setting, the applicable standard of care is to follow up every positive FOBT with a colonoscopy. Rather, those materials *advocate* following up a positive FOBT with a colonoscopy in every instance, but they also set forth data showing that this is not done by physicians in one-third of cases reported in the NHIS survey.[2]

There are in fact *certain circumstances* in which, "a plaintiff either relies on a recognized standard or authoritative medical text or treatise, ..., or is himself a qualified medical expert," and therefore expert testimony is not required to establish the relevant standard of care. *Ex parte HealthSouth Corp.*, 851 So.2d at 42. Those circumstances are not before the court, and that limited exception does not apply here. The documents submitted by Plaintiff do not establish that it is either the standard of care in a walk-in urgent care clinic to follow up all FOBTs with a colonoscopy, or that there is substantial evidence that Defendants' failure to do so subjects them to liability under the AMLA.

**III.    Conclusion**

For the reasons discussed above, Defendants' motions for summary judgment (Docs. # 146 and 147) are due to be granted. The court will enter a separate order granting the motions.

---

[2] This data readily dispenses with Plaintiff's argument that the alleged negligence here is "readily understood by a layman." (*See* Doc. # 150 at 8).

**DONE** and **ORDERED** this     29th     day of February, 2012

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE